United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 7, 1995     Decided July 7, 1995

No. 94-7091

UNITED STATES OF AMERICA
*EX REL.,* MERVYN A. SCHWEDT,
APPELLANT

v.

PLANNING RESEARCH CORPORATION,
A VIRGINIA CORPORATION,
APPELLEE

————-

Appeal from the United States District Court
for the District of Columbia

(No. 92cv01951)

————-

*William G. Kopit* argued the cause and filed the briefs for appellant. *Mervyn A. Schwedt* entered an appearance *pro se.*

*Frederick M. Levy* argued the cause for appellee. With him on the brief was *Gregory T. Jaeger.*

Before: EDWARDS, *Chief Judge;* WALD and GINSBURG, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* WALD.

WALD, *Circuit Judge:* Mervyn A. Schwedt, Director of the Office of Information Management at the Department of Labor's Pension and Welfare Benefits Administration ("PWBA"), brought this action against Planning Research Corporation ("PRC") under the *qui tam* provision of the False Claims Act ("Act"), 31 U.S.C. § 3729 *et seq.* (1988 & Supp. V 1993). Schwedt claims that in the course of performance of a contract under which PRC was to design a software system for the PWBA, PRC submitted false progress reports about the status and success of the system, inducing the government to pay for various components of the project that it would not otherwise have

accepted. The district court dismissed most of Schwedt's complaint and granted summary judgment to PRC on the remainder. *See United States ex rel. Schwedt v. Planning Research Corp., Inc.,* No. Civ. 92-1951-LFO, slip op. at 8, 10 (D.D.C. Mar. 31, 1994). We hold that Schwedt has made sufficient allegations to proceed on his claim that PRC's progress reports constitute false claims under the Act, for which he may pursue the statutory civil penalty, and on his claim that these progress reports caused the government to accept and pay for various items under the contract that were worthless on their own, for which he may pursue treble damages under the Act.

I. BACKGROUND

In 1989, the PWBA entered into a contract with PRC under which PRC was to design and put into place a computer software system that would link the PWBA's national and field offices. The terms of this agreement are embodied in two documents, a Task Order and a Contract. Under the Task Order, PRC is to complete seven sequential segments, termed "milestones," running from the initial design of the system through production of software and manuals to presentation of a final report. Task Order at 5-12, *reprinted in* Appellee's Supplemental Appendix ("S.A.") at 13-20. The Task Order also sets out a series of individual "deliverables," such as the software, training manuals, and reports, each of which is due at a particular stage of the project and is to be paid for upon acceptance by the government. Task Order at 12, *reprinted in* S.A. at 20.

The Task Order and Contract establish an acceptance and payment system for each of the deliverables. Upon receipt of the software, for instance, the government has a 20-day "Client Acceptance Period" during which it will "complete review of each deliverable and accept or reject the deliverable in writing. [It] will have the right to reject or require correction of any deficiencies that are contrary to the information contained in the contractor's accepted proposal." Task Order at 20, *reprinted in* S.A. at 28. Under the agreement, the government will accept the software only "if it is complete, comprehensive and complies with" the contract specifications. *Id.* Finally, no payment can be requested or made absent such acceptance: "[a]ny deliverable products under this contract will be accepted or rejected" in writing by the government, Contract ¶ E.1, *reprinted in* S.A. at 61, and "[p]ayment of invoices will be made based upon acceptance by the Government," Contract ¶ D.a.,

*reprinted in* S.A. at 62.

In the course of performing the contract, PRC made four deliveries of the software and submitted three progress reports. The first and last of these progress reports represented that the software was "100%" complete; the second represented that each of the four software components was either "99%" or "100%" complete. Progress Report of July 9, 1990, at 2, *reprinted in* S.A. at 64; Progress Report of Dec. 5, 1990, at 2, *reprinted in* S.A. at 67; Progress Report of Mar. 11, 1991, at 2, *reprinted in* S.A. at 70. According to allegations in the complaint and affidavit filed by Schwedt, who was responsible for overseeing the contract, the government rejected the software after testing on each of these occasions. At some point after the fourth delivery, however, the government did accept and pay $145,534 for one of the four sub-parts of the software. During this same period, the government also accepted and paid an additional $364,000 for other non-software deliverables. Over the course of performance, according to allegations in Schwedt's affidavit, PRC submitted two written requests for "equitable adjustments" approaching $2 million in excess of the original contract amount and made two oral demands for payment for the software. Schwedt Aff. ¶¶ 14-18, *reprinted in* Appellant's Appendix ("A.A.") at 32-33. The filings do not detail the basis on which PRC claimed entitlement to the equitable adjustments.

In 1992, Schwedt filed this *qui tam* action, alleging that PRC violated the False Claims Act by "unlawfully and knowingly on no less than four occasions present[ing] and caus[ing] to be presented non-functional and non-compliant software to representatives of the United States while wrongfully and knowingly misrepresenting that said software was compliant and functional." Complaint ¶ 25, *reprinted in* A.A. at 12.

The district court dismissed the bulk of Schwedt's complaint under Federal Rule of Civil Procedure 9(b) for failure to meet the heightened pleading requirements for fraud and granted summary judgment on the only claim it believed to be adequately pleaded. It held that several of the alleged "false claims"—the $364,000 in payments for unidentified, non-software deliverables and the two requests for equitable adjustment—were not identified with adequate specificity to meet the heightened pleading requirements for fraud. FED. R. CIV. P. 9(b). With respect to the single alleged

"false claim" it found to be adequately pleaded—PRC's invoice for the one software component accepted by the government—it concluded that, even if it were a "false claim," Schwedt could not show any damages, because under the terms of the contract the government had to inspect and approve any PRC submission before payment. The district court did not discuss whether the progress reports themselves might constitute "false claims" or "statements" under the Act, and it neglected to address the provision of the Act imposing a civil penalty for the mere submission of a false claim, whether or not that claim brings about any damages.

## II. ANALYSIS

The False Claims Act provides that:

> Any person who
>
> > (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval; [or] (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government ...
>
> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person....

31 U.S.C. § 3729(a) (1988). Thus, the Act imposes two sorts of liability. First, the submitter of a "false claim" or "statement" is liable for a civil penalty, regardless of whether the submission of the claim actually causes the government any damages; even if the claim is rejected, its very submission is a basis for liability. Second, the submitter of the claim is liable for damages that the government sustains because of the submission of the false claim.

A. *"False Claims"*

The Act penalizes the presentation of a "false or fraudulent claim for payment" or the use of "a false record or statement to get a false or fraudulent claim paid." 31 U.S.C. § 3729(a). A submission need not be an actual invoice to be a "claim" or "statement" under the Act. As the Supreme Court explained in *United States v. Neifert-White Co.,* 390 U.S. 228, 233 (1968), "[t]his remedial statute reaches beyond "claims' which might be legally enforced, to all fraudulent attempts to cause the Government to pay out sums of money." Each individual false claim or statement

triggers the statute's civil penalty. *See United States v. Bornstein,* 423 U.S. 303, 313 (1976).

Schwedt's complaint identifies the false claims on which he bases his action: "on no less than four occasions [PRC] present[ed] and cause[d] to be presented non-functional and non-compliant software to representatives of the United States while wrongfully and knowingly misrepresenting that said software was compliant and functional." Complaint ¶ 25, *reprinted in* A.A. at 12. In dismissing the bulk of this complaint, the district court failed to consider that the individual progress reports, though not in themselves actual invoices, might constitute "false claims" or "statements" under the Act.

We hold that if, as Schwedt alleges, PRC knowingly submitted false progress reports stating that the software delivered during the same period was complete when in fact it was not, then these progress reports would constitute false statements in support of false claims and would trigger the Act's civil penalty. That the progress reports are not invoices is immaterial. They were submitted during the same period that the software was delivered, and they certify the satisfactory completion of that software. Though PRC did not submit a bill for the software, its goal of receiving payment was implicit in the submission of the goods, and the accompanying progress reports had the purpose of "get[ting] ... [the] claim ... approved." 31 U.S.C. § 3729(a)(2). Accordingly, Schwedt's complaint states a claim based on the three progress reports, and Schwedt may proceed on these claims.

From Schwedt's affidavit, but not his complaint, it is possible to discern allegations of a distinct set of false claims. This filing can be read to claim that PRC made an initial misrepresentation about its capability to perform the contract in order to induce the government to enter into the contract and that this original misrepresentation tainted every subsequent claim made in relation to the contract, including PRC's claims for payment for the non-software deliverables and its claims for equitable adjustments. *Cf. United States v. Marcus ex rel. Hess,* 317 U.S. 537, 543 (1943) (where original contract was obtained through collusive bidding, initial "taint entered into every swollen estimate which was the basic cause for payment of every dollar paid"). At oral argument, however, Schwedt declined to pursue this theory, informing the court that the allegedly false progress reports constitute the heart of his suit. We therefore hold that any fraud in the inducement claim potentially

discernible from Schwedt's affidavit is waived.[1]

B. *Damages*

Schwedt claims that PRC is liable not only for the statutory civil penalty for each progress report submitted, but also for damages that the government suffered because of these progress reports. He alleges that he made, on behalf of the government, a total of approximately $500,000 in payments for various deliverables under the contract because of PRC's progress report representations that the project would ultimately come together and that these payments are therefore damages recoverable under the Act: "*But for* the progress reports and representations by PRC, I would *not* have accepted and paid for the milestone products which are worthless without contractually compliant software." Schwedt Aff. ¶ 10, *reprinted in* A.A. at 31.

The statute holds the submitter of a false claim or statement liable for "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a). We hold that if Schwedt is able to prove that he relied on the progress reports' representations that the project was nearing successful completion in deciding to pay for the individual components, those payments may constitute damages under the Act. PRC urges that because the contract between PRC and the government allowed for payments *only* upon the government's *own* inspection and acceptance of the deliverables, Schwedt cannot establish that these payments are "because of" the alleged false statements and thus cannot claim them as damages under the Act. This argument, however, misstates the logic of Schwedt's claim. Under Schwedt's allegations, it is immaterial that the government found the *individual* components to be contractually compliant or even that they were, in fact, compliant. He urges that even if, say, the manual was in *perfect* form, it was useless to the government without the whole package, and he would not have paid for it if not for PRC's representations that the whole package was imminently available. If Schwedt is able to establish what he alleges, he has surely established damages "because of" the allegedly false progress reports.

---

[1] Because we find that the only theory on which the equitable adjustments and the invoices for accepted goods are potentially relevant as "false claims" is waived, we need not address the district court's conclusion that these "claims" were inadequately pleaded under Federal Rule of Civil Procedure 9(b).

PRC further points to several circuits that have concluded that the Act does not contemplate liability for all damages that would not have arisen "but for" the false statement. *See United States v. Miller,* 645 F.2d 473, 475-76 (5th Cir. 1981); *United States v. Hibbs,* 568 F.2d 347, 351 (3d Cir. 1977). Surely, we agree. Schwedt's claim, however, survives under the more restrictive standard adopted in those cases. The Third and Fifth Circuits there concluded that the submitter of a false claim should be liable only for those damages that arise because of the *falsity* of the claim, *i.e.,* only for those damages that would not have come about if the defendant's misrepresentations had been true. *See Miller,* 645 F.2d at 475-76; *Hibbs,* 568 F.2d at 351. In this case, if PRC's misrepresentations had been true—that the software, which formed the heart of the contract, was at or near successful completion—then the government's payments for various goods would not have been damages—money spent on useless goods. The payments would have been money well spent. Thus, we conclude that Schwedt may proceed on his claim that the false certifications in the progress reports led him to accept and pay for the various deliverables and that these payments constitute damages under the Act.

We pause to note, however, that our conclusion on this point might have been different if PRC could demonstrate that the contract was structured in such a way that, regardless of any misrepresentations it may have made about its progress in performing the other aspects of the contract, the government was contractually required to pay for any delivered components that met the contract's specifications. If the contract has been so structured, then the alleged misrepresentations concerning PRC's ability to perform the rest of the project would not have caused any damages at all; they would simply be irrelevant. PRC cannot make such a demonstration, however, because the contract empowers the government to terminate the contract for default if the contractor's performance is defective and the contractor fails to take steps to "ensure future performance in conformity with contract requirements." Contract ¶ E.2(e), *reprinted in* S.A. at 61. Absent PRC's (alleged) misrepresentations concerning its ability to perform the rest of the contract, the government could have, by terminating the contract prior to accepting those deliverables that it ultimately concluded met the contract specifications, avoided making payment (and thus incurring

damages).

## III. CONCLUSION

In accordance with the discussion above, the opinion of the district court is affirmed in part and reversed in part and the case is remanded so that Schwedt may pursue his claim that the individual progress reports constitute false claims giving rise to civil penalties and to damages liability.

*Remanded.*